

**IN THE**
**TENTH COURT OF APPEALS**

_____

**No. 10-23-00402-CV**

**IN THE INTEREST OF C.H. AND I.P., CHILDREN**

_____

**From the 77th District Court**
**Limestone County, Texas**
**Trial Court No. CPS-410-A**

**MEMORANDUM  OPINION**

The mother of C.H. and I.P. and the father of I.P. appeal from a judgment that terminated their parental rights. *See* TEX. FAM. CODE §161.001(b). The mother complains that the evidence was legally and factually insufficient for the trial court to have found that she endangered the children pursuant to Section 161.001(b)(1)(D) or (E), failed to complete her service plan pursuant to Section 161.001(b)(1)(O), and that termination was in the best interest of the children. The father complains that the evidence was legally and factually insufficient for the trial court to have found that termination was in the best

interest of I.P.[1]  Because we find no reversible error, we affirm the judgment of the trial court.

**STANDARD OF REVIEW—LEGAL AND FACTUAL SUFFICIENCY**

The standards of review for legal and factual sufficiency of the evidence in cases involving the termination of parental rights are well established and will not be repeated here.  *See In re J.F.C.*, 96 S.W.3d 256, 264-68 (Tex. 2002) (legal sufficiency); *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002) (factual sufficiency); *see also In re J.O.A.*, 283 S.W.3d 336, 344-45 (Tex. 2009).  If the evidence is sufficient as to one ground, it is not necessary to address other predicate grounds because sufficient evidence as to only one ground in addition to the best interest finding is necessary to affirm a termination judgment.  *In re N.G.*, 577 S.W.3d 230, 232-33 (Tex. 2019).

**SECTION 161.001(b)(1)(E)**

In the mother's first issue, the mother complains that the evidence was legally and factually insufficient for the trial court to have found that she "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endangers the physical or emotional well-being of the child[ren]."  TEX. FAM. CODE §161.001(b)(1)(E). "'[E]ndanger' means to expose to loss or injury" or "to jeopardize." *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021) (*quoting Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex.

---

[1] C.H.'s father's parental rights were terminated after he executed a voluntary affidavit of relinquishment of his parental rights, and he did not appeal the judgment.

1987)).  Under Subsection (E), the relevant inquiry is whether evidence exists that the endangerment of the children's physical and emotional well-being was the direct result of the parent's conduct, including acts, omissions, or failures to act.  *See id.; see also* TEX. FAM. CODE § 161.001(b)(1)(E).  The endangering conduct need not be directed at the children, nor must the children actually suffer injury.  *In re J.F.-G.*, 627 S.W.3d at 312.  The specific danger to a child's well-being may be inferred from parental misconduct standing alone.  *See In re R.W.*, 129 S.W.3d 732, 739 (Tex. App.—Fort Worth 2004, pet. denied) ("As a general rule, conduct that subjects a child to a life of uncertainty and instability endangers the physical and emotional well-being of a child.").  Evidence that a parent "exposed her children to domestic violence" may also support a finding of endangerment under Subsection (E).  *In re M.R.*, 243 S.W.3d 807, 819 (Tex. App.—Fort Worth 2007, no pet.).  This may be true even when the parent is the victim of the domestic violence when that parent continues to expose the children to the violence and does not take affirmative steps to eliminate the potential harm to the children.  *See In the Int. of P.P.-S.*, No. 02-23-00309-CV, 2024 Tex. App. LEXIS 188 at *15, 2024 WL 123654 (Tex. App.—Fort Worth Jan. 11, 2024, no pet.) (mem. op.).

The father had engaged in assaultive behavior against women for some time, including the mother.  He was convicted for an assault involving family violence in January of 2021, where the mother was shown to be the victim even though the father claimed he did not remember who the victim was.

Another incident occurred in December of 2021 where the father and mother and C.H. were riding in a car together while she was pregnant with I.P. and the father began punching the mother in the face while driving, leaving her with injuries. The father alleged that the mother had burned his face with a cigarette butt but no injury was observed on him. The mother grabbed the father's prescription glasses and threw them out of the car window. When the father went to retrieve the glasses, the mother drove away from the scene. The father was later arrested and photos of the mother's injuries were taken. However, the mother later filed an affidavit of non-prosecution because she did not want the father to be in jail.

Another incident took place in July of 2022 where the police were called on the father. The mother told police that she and the father had been arguing for a couple of days and he snapped when she called him a bad name. She was changing the baby who was only a week or two old while the mother and father were arguing over his cell phone, which he believed the mother was hiding somewhere behind her. The mother started breastfeeding I.P. when the father leaned aggressively over the mother and I.P., "squishing" the baby between the father and mother, as C.H. described to his therapist. The baby was screaming and crying. The mother told C.H. to go to a neighbor's house and to call 9-1-1. The father was gone before the police arrived, but was later arrested for violating his community supervision from a prior assault conviction. The officers who met with the mother observed bruising in various stages of healing on the outside of the

mother's forearm, although the mother denied that the father had caused the bruising on that occasion. The father also told officers that the mother had hit him in the head with a can of peaches and a Dr. Pepper the day before this incident. It was after this incident that the children were removed from the mother and father.

Later, C.H. relayed his experiences to his therapist in a matter of fact tone and stated, "I witnessed everything." C.H. also told the therapist that "dad jumped on mom," and that she was "holding the baby." C.H. stated that the mother and father were fighting and that he had seen and heard everything. He was also in the car when the father hit the mother in the car.

The mother's service plan required her to complete individual therapy, a protective parenting class, and domestic violence therapy. She was unsuccessfully discharged from each. The father's service plan required him to complete a batterer's intervention program, individual counseling, anger management classes, and protective parenting. He completed none of those services, but did complete an anger management class through his community supervision shortly before the trial. Overall, neither parent completed the services needed to address the assaultive behavior that had taken place between the parents.

We find that the evidence was legally and factually sufficient for the trial court to have found that the mother engaged in conduct and knowingly placed the children with a person who engaged in conduct which endangered the physical and emotional well-

being of the children. Although counsel for the mother argues on appeal that the mother was solely the victim, did not abuse the children herself, the case was not "repeated," and she did not have major visible injuries that she should not be considered to be a "perpetrator" because of the father's abusive conduct. We disagree with counsel's view of the evidence. There was evidence that the trial court could have found to be credible that the mother also committed assaultive acts against the father. Each of the primary instances of violence between the parents occurred in the presence of the children and at times when one or both of them were at a substantial risk of physical injury. The mother's response was to minimize the father's conduct and to refuse to complete any of the services that the trial court required her to participate in for her to get the children returned to her. There was photographic evidence in the record as to physical injuries on the mother. Under the facts of this case, viewing the evidence under the appropriate standards for legal and factual sufficiency of the evidence, the trial court did not err in its finding that the mother engaged in endangering conduct or allowed the children to remain in a home with a person who engaged in endangering conduct pursuant to Section 161.001(b)(1)(E). We overrule the mother's issue one. Because we have found the evidence was sufficient as to one ground, we do not need to address the mother's second issue as to her service plan.

**BEST INTEREST OF THE CHILDREN**

In the mother's third issue, the mother complains that the evidence was legally and

factually insufficient for the trial court to have found that termination of C.H. and I.P. was in their best interest. In the father's sole issue, the father complains that the evidence was legally and factually insufficient for the trial court to have found that termination of I.P. was in his best interest. In determining the best interest of a child, a number of factors have been consistently considered which were set out in the Texas Supreme Court's opinion, *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). This list is not exhaustive, but simply lists factors that have been or could be pertinent in the best interest determination. *Id*. There is no requirement that all of these factors must be proved as a condition precedent to parental termination, and the absence of evidence about some factors does not preclude a factfinder from reasonably forming a strong conviction that termination is in the children's best interest. *See In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002). The *Holley* factors focus on the best interest of the child, not the best interest of the parent. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). Evidence relating to the predicate grounds under section 161.001(b)(1) also may be relevant to determining the best interest of the children. *See C.H.*, 89 S.W.3d at 27-28.

It is undisputed that neither party completed any aspect of their service plan outside of participating in visits with the children. C.H., for a young child, expressed a desire to go home to the mother and father, but also recognized that his parents had things they had to do for that to occur. C.H. also was aware that his parents had not done

the necessary things for him to return and was happy to remain in his current placement if he could not go home. C.H. was upset that his parents had not done what they needed to and was further upset by his parents' failure on multiple occasions to follow through on promises they made to him at visitations during the pendency of this case.

Both parents admitted that they were not in a position to have the children returned to them at the time of trial. They had lived in multiple locations and had various jobs throughout the proceedings. Both argued for the trial court to not terminate their parental rights but to name them possessory conservators of the children and to name the current placement the managing conservator. However, the current placement testified that she was asking for termination because she believed that the children needed permanency that they would not get otherwise. The current placement was known to the parents and the foster mother's name had been given to the department by the mother.

Both C.H. and I.P. were bonded to the foster parents and were doing well in that placement. The foster parents planned to adopt the children if the termination was granted, but were amenable to allowing the parents to have some relationship with the children in the future as long as it was positive for the children to do so.

The mother contends that because she was solely a victim, she should have been treated differently during the proceedings as someone who did not endanger the children, and that the trial court could have terminated the father's rights but not hers.

That might be possible if not for the fact that the mother made excuses for the father's behavior, stayed with him and attempted to ensure that he was not prosecuted for his conduct, and remained with him even though neither parent completed any of the services that would have assisted them in addressing the violence in their relationship. The evidence could be construed in a way to believe that the mother is a victim. However, she is an adult who was responsible for the physical and emotional well-being of the children. The children were victims as well, having been present and put in danger by the father and the mother's actions, yet they were unable to protect themselves. The mother's claim that they have not had any recent disagreements that rose to the level of the violence that led to the removal of the children was just that—a claim that the trial court was free to believe or disbelieve. There was testimony regarding disagreements that were observed between the parents during visitations and the mother testified that she and the father still had disagreements, although they were not violent. The foster mother who had agreed to supervise visits asked that she not supervise the visits after C.H. and I.P.'s mother would attempt to start conflict with the foster mother in front of the children.

The actions of both parents throughout the proceedings demonstrated that they were unable to provide a stable home environment for the children, did little to nothing to address the reasons for the removal of the children, repeatedly broke promises to C.H. which upset him, and agreed that they were not in a position to have the children

returned to them at the time of the trial. When we view the evidence using the appropriate standards for legal and factual sufficiency, we find that the trial court's finding that termination was in the best interest of the children was legally and factually sufficient as to the mother and the father. We overrule the mother's third and the father's sole issue.

**CONCLUSION**

Having found no reversible error, we affirm the judgment of the trial court.


TOM GRAY
Chief Justice

Before Chief Justice Gray,
      Justice Johnson, and
      Justice Smith
Affirmed
Opinion delivered and filed June 6, 2024
[CV06]

